Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BONNIE L. FRANKLIN, Individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>      v.<br><br>DIDI GLOBAL INC., WILL WEI CHENG, JEAN QING LIU, STEPHEN JINGSHI ZHU, ALAN YUE ZHUO, ZHIYI CHEN, MARTIN CHI PING LAU, KENTARO MATSUI, ADRIA PERICA, DANIEL YONG ZHANG, GOLDMAN SACHS (ASIA) L.L.C., MORGAN STANLEY & CO. LLC, J.P. MORGAN SECURITIES LLC, BOFA SECURITIES, INC., BARCLAYS CAPITAL INC., CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED,<br><br>(Additional Defendants on Next Page) | No. 2:21-cv-05486-RGK-SK<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>CLASS ACTION</u><br><br>JURY TRIAL DEMANDED |

| |
|---|
| CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, CITIGROUP GLOBAL MARKETS INC., GUOTAI JUNAN SECURITIES (HONG KONG) LIMITED, HSBC SECURITIES (USA) INC., UBS SECURITIES LLC, BOCI ASIA LIMITED, BOCOM INTERNATIONAL SECURITIES LIMITED, CCB INTERNATIONAL CAPITAL LIMITED, CLSA LIMITED, CMB INTERNATIONAL CAPITAL LIMITED, FUTU INC., ICBC INTERNATIONAL SECURITIES LIMITED, MIZUHO SECURITIES USA LLC, TIGER BROKERS (NZ) LIMITED, COLLEEN A. DE VRIES, and COGENCY GLOBAL, INC., |
| Defendants. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Plaintiff Bonnie L. Franklin ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, announcements, public filings, wire and press releases published by and regarding DiDi Global Inc. ("DiDi," or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded DiDi securities: (1) pursuant and/or traceable to the registration statement and related prospectus (collectively, the "Registration Statement") issued in connection with DiDi's June 30, 2021 initial public offering (the "IPO" or "Offering"); and/or (2) between June 30, 2021 and July 2, 2021, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act") and violations of Sections 10(b) and  20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

2.     On or about June 30, 2021, Defendants held the IPO, issuing approximately 316,800,000 American Depositary Shares ("ADSs") to the investing public at $14.00 per ADS, pursuant to the Registration Statement.

3.     By the commencement of this action, the Company's ADSs trade significantly below the IPO price. As a result, investors were damaged.

2

**JURISDICTION AND VENUE**

4.      The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§77k, 77l(a)(2) and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5.

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the Securities Act and 28 U.S.C. §1331 and §27 of the Exchange Act.

6.      This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. The Company also maintains a research office in this District focused on natural language processing and speech technologies.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of the Defendants' actions, and the subsequent damages took place within this District and §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this District.

8.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of DiDi securities in this District.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

## PARTIES

9.     Plaintiff, as set forth in the previously filed certification incorporated by reference herein, purchased the Company's securities at artificially inflated prices pursuant to the IPO and during the Class Period and was damaged upon the revelation of the corrective disclosure.

10.     Defendant DiDi purports to be a mobility technology platform, providing ride hailing and other services in the People's Republic of China ("PRC"), Brazil, Mexico, and internationally. It offers ride hailing, taxi hailing, chauffeur, hitch, and other forms of shared mobility services, as well as enterprise business ride solutions; auto solutions comprising leasing, refueling, and maintenance and repair services; electric vehicle leasing services; bike and e-bike sharing, intra-city freight, food delivery, and financial services. The Company was formerly known as Xiaoju Kuaizhi Inc. and changed its name to DiDi Global Inc. in June 2021. The Company is often called "the Uber of China."

11.     The Company is incorporated in the Cayman Islands and its head office is located at No. 1 Block B, Shangdong Digital Valley, No. 8 Dongbeiwang West Road, Haidian District, Beijing, PRC. DiDi securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "DIDI."

12.     Defendant Will Wei Cheng ("Cheng") was at the time of the IPO and throughout the Class Period the Company's Chief Executive Officer and Chairman of the Board of Directors.

13.     Defendant Jean Qing Liu ("Liu") was at the time of the IPO and throughout the Class Period the Company's President and a Director.

14.     Defendant Stephen Jingshi Zhu ("Zhu") was at the time of the IPO and throughout the Class Period the Company's Senior Vice President and Chief Executive Officer of International Business Group and a Director.

4

15.     Defendant Alan Yue Zhuo ("Zhuo") was at the time of the IPO and throughout the Class Period the Company's Chief Financial Officer.

16.     The Defendants named in ¶¶ 12-15 are sometimes referred to herein as the "Executive Defendants."

17.     Each of the Executive Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

18.     The Company is liable for the acts of the Executive Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

19.     The scienter of the Executive Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

5

20.     Defendant Zhiyi Chen was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

21.     Defendant Martin Chi Ping Lau was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

22.     Defendant Kentaro Matsui was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

23.     Defendant Adrian Perica was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

24.     Defendant Daniel Yong Zhang was a Director of the Company at the time of the IPO and signed or authorized the signing of the Company's Registration Statement.

25.     The Defendants named in ¶¶ 20-24 are sometimes referred to herein as the "Director Defendants."

26.     The Executive Defendants and the Director Defendants are sometimes referred to herein as the "Individual Defendants."

27.     Each of the Individual Defendants signed or authorized the signing of the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential DiDi investors, all motivated by their own and the Company's financial interests.

28.     Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") is an investment banking firm that acted as a representative underwriter of the

6

Company's IPO, helping to draft and disseminate the IPO documents. Goldman Sach's address is 68th Floor, Cheung Kong Center, 2 Queen's Road, Central, Hong Kong Special Administrative Region of the PRC.

29.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is an investment banking firm that acted as representative underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Morgan Stanley's address is 1585 Broadway, New York, NY 10036.

30.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") is an investment banking firm that acted as representative underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. J.P. Morgan's address is 383 Madison Avenue, New York, NY 10179.

31.     Defendant BofA Securities, Inc. ("BofA") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. BofA's address is One Bryant Park, New York, NY 10036.

32.     Defendant Barclays Capital Inc. ("Barclays") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Barclays' address is 745 Seventh Avenue, New York, NY 10019.

33.     Defendant China Renaissance Securities (Hong Kong) Limited ("China Renaissance") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. China Renaissance's address is Units 8107-08, Level 81, International Commerce Centre, 1 Austin Road West, Kowloon, Hong Kong Special Administrative Region of the PRC.

34.     Defendant China International Capital Corporation Hong Kong Securities Limited ("CICC") is an investment banking firm that acted as

7

underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. CICC's address is 29/F, One International Finance Centre, 1 Harbour View Street, Central, Hong Kong Special Administrative Region of the PRC.

35. Defendant Citigroup Global Markets Inc. ("Citigroup") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Citigroup's address is 388 Greenwich Street, New York, NY 10013.

36. Defendant Guotai Junan Securities (Hong Kong) Limited ("Guotai Junan") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Guotai Junan's address is 27/F., Low Block, Grand Millennium Plaza, 181 Queen's Road Central, Hong Kong Special Administrative Region of the PRC.

37. Defendant HSBC Securities (USA) Inc. ("HSBC") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. HSBC's address is 452 Fifth Avenue, New York City, NY 10018.

38. Defendant UBS Securities LLC ("UBS") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. UBS' address is 1285 Avenue of The Americas, New York, NY 10019.

39. Defendant BOCI Asia Limited ("BOCI") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. BOCI's address is 26th Floor, Bank of China Tower 1 Garden Road, Central, Hong Kong Special Administrative Region of the PRC.

40. Defendant BOCOM International Securities Limited ("BOCOM") is an investment banking firm that acted as underwriter of the Company's IPO,

helping to draft and disseminate the IPO documents. BOCOM's address is 9th Floor, Man Yee Building, 68 Des Voeux Road, Central, Hong Kong Special Administrative Region of the PRC.

41.    Defendant CCB International Capital Limited ("CCB") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. CCB's address is 12/F, CCB Tower, 3 Connaught Road Central, Central, Hong Kong Special Administrative Region of the PRC.

42.    Defendant CLSA Limited ("CLSA") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. CLSA's address is 18/F, One Pacific Place, 88 Queensway, Hong Kong Special Administrative Region of the PRC.

43.    Defendant CMB International Capital Limited ("CMB") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. CMB's address is 45F, Champion Tower, 3 Garden Road, Central, Hong Kong Special Administrative Region of the PRC.

44.    Defendant Futu Inc. ("Futu") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Futu's address is 720 University Avenue, Suite 100, Palo Alto, CA 94301.

45.    Defendant ICBC International Securities Limited ("ICBC") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. ICBC's address is 37/F, ICBC Tower, 3 Garden Road, Hong Kong Special Administrative Region of the PRC.

46.    Defendant Mizuho Securities USA LLC ("Mizuho") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and

9

disseminate the IPO documents. Mizuho's address is 1271 Avenue of the Americas, Floors 2, 3, 4, 18, and 19, New York, NY 10020.

47.    Defendant Tiger Brokers (NZ) Limited ("Tiger Brokers") is an investment banking firm that acted as underwriter of the Company's IPO, helping to draft and disseminate the IPO documents. Tiger Brokers' address is Level 16, 191 Queen Street, Auckland Central, New Zealand, 1010.

48.    Defendants named in ¶¶ 28-47 are referred to herein as the "Underwriter Defendants."

49.    Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)    The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared substantial fees from the IPO collectively. The Underwriter Defendants arranged a roadshow prior to the IPO during which they, and representatives from the Company, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)    The Underwriter Defendants also obtained an agreement from the Company and the Individual Defendants that DiDi would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.

(c)    Representatives of the Underwriter Defendants also assisted the Company and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of the Company, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due

10

diligence," the Underwriter Defendants had continual access to internal, confidential, and current corporate information concerning the Company's most up-to-date operational and financial results and prospects.

(d)     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with the Company's lawyers, management, and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's securities would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about the Company's would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and the Company's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the Company's existing problems as detailed herein.

50.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

51.     Defendant Colleen A. De Vries ("De Vries") was at the time of the IPO DiDi's duly authorized representative in the United States. Defendant De Vries signed the false and misleading Registration Statement on her own behalf and on behalf of Defendant Cogency Global Inc. ("Cogency Global"), Defendant De Vries' employer.

52.     Defendant Cogency Global was DiDi's authorized U.S. representative for purposes of the IPO. Defendant De Vries, who signed the Registration

11

Statement, was an employee of Defendant Cogency Global. As a result, Defendant Cogency Global is liable for the securities law violations committed by Defendant De Vries in its capacity as employer and as a control person under the Securities Act

53.     The Company, the Individual Defendants, the Underwriter Defendants, Defendant De Vries, and Cogency Global are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### DiDi's False and/or Misleading Registration Statement

54.     On June 10, 2021, DiDi (then-named Xiaoju Kuaizhi Inc.) filed with the SEC a registration statement on Form F-1, which in combination with subsequent amendments on Forms F-1/A and filed pursuant to Rule 424(b)(4), are collectively referred to as the Registration Statement and issued in connection with the IPO.

55.     On June 30, 2021, DiDi filed with the SEC the final prospectus for the IPO on Form 424B4, which forms part of the Registration Statement. In the IPO, DiDi sold 316,800,000 ADSs at $14.00 per share.

56.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

57.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

58.     The Registration Statement emphasized that DiDi relied on the market in China for its operations, stating that "China is the best starting place for realizing

12

[DiDi's] vision for mobility" and "China's mobility market is expected to reach US$3.9 trillion by 2040, by which time the penetration of shared mobility and electric vehicles is expected to have increased to 35.9% and 50.2%, respectively…"

59.    DiDi also stated that "[i]n 2020, the number of ride hailing transactions from our top five cities in China constituted approximately 20% of our total China ride hailing transactions." Therefore, "any changes to local laws or regulations within these cities that affect [the Company's] ability to operate or increase [its] operating expenses in these markets would have an adverse effect on our business."

60.    However, throughout the Registration Statement, DiDi neglected to raise concerns about the ongoing discussions the Company was having with Chinese authorities related to DiDi's non-compliance with certain technology-related and cybersecurity laws and regulations, including with regard to collecting and using personal information.

61.    Rather than disclose the known discussions into the Company's practices and non-compliance with relevant technology laws, the Registration Statement vaguely discussed China's regulatory regime with regards to data security. Thus, the risk disclosures themselves were materially misleading because they failed to disclose the ongoing discussions with Chinese authorities or the Company's non-compliance with the relevant regulations. Specifically, the Registration Statement represented that:

**Regulation Relating to Internet Security**

The PRC government has enacted various laws and regulations with respect to internet security and protection of personal information from any inappropriate collection activities, abuse or unauthorized disclosure. Internet information in the PRC is regulated and restricted from a national security standpoint. …

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

According to the Cybersecurity Law and other related laws and regulations, internet service providers are required to take measures to ensure internet security by complying with security protection obligations, formulating cybersecurity emergency response plans, and providing technical assistance and support for public security and national security authorities. In addition, any collection, process and use of a user's personal information must be subject to the consent of the user, be legal, rational and necessary, and be limited to specified purposes, methods and scopes. An internet service provider must also keep such information strictly confidential, and is further prohibited from divulging, tampering with or destroying any such information, or selling or providing such information to other parties illegally.

***Failure to comply with the above laws and regulations may subject the internet service providers to administrative penalties including, without limitation, fines, suspension of business operation, shut-down of the websites, revocation of licenses and even criminal liabilities.***

On June 10, 2021, the Standing Committee of the National People's Congress of China promulgated the Data Security Law, which will take effect in September 2021. ***The Data Security Law provides for data security and privacy obligations on entities and individuals carrying out data activities.*** The Data Security Law also introduces a data classification and hierarchical protection system based on the importance of data in economic and social development, as well as the degree of harm it will cause to national security, public interests, or legitimate rights and interests of individuals or organizations when such data is tampered with, destroyed, leaked, or illegally acquired or used. ***The appropriate level of protection measures is required to be taken for each respective category of data. For example, a processor of important data shall designate the personnel and the management body responsible for data security, carry out risk assessments for its data processing activities and file the risk assessment reports with the competent authorities. In addition, the Data Security Law provides a national security review procedure for those data activities which may affect national security and imposes export restrictions on certain data and information.*** As the Data Security Law was recently

14

promulgated and has not yet taken effect, we may be required to make further adjustments to our business practices to comply with this law.

**Regulations Relating to Privacy Protection**

In recent years, PRC government authorities have enacted laws and regulations on internet use to protect personal information from any unauthorized disclosure. The Cyber Security Law imposes certain data protection obligations on network operators, including that network operators may not disclose, tamper with, or damage users' personal information that they have collected, or provide users' personal information to others without consent. Exempted from these rules is information irreversibly processed to preclude identification of specific individuals. Moreover, network operators are obligated to delete unlawfully collected information and to amend incorrect information.

The Several Provisions on Regulating the Market Order of Internet Information Services, issued by the MIIT on December 29, 2011 and effective on March 15, 2012, stipulate that internet information service providers may not collect any user personal information or provide any such information to third parties without the consent of a user, unless otherwise stipulated by laws and administrative regulations. "User Personal information" is defined as information relevant to the users that can lead to the recognition of the identity of the users independently or in combination with other information. An internet information service provider must expressly inform the users of the method, content and purpose of the collection and processing of such user personal information and may only collect such information as necessary for the provision of its services. ***An internet information service provider is also required to properly store user personal information***, and in case of any leak or likely leak of the user personal information, the internet information service provider must take immediate remedial measures and, in severe circumstances, make an immediate report to the telecommunications regulatory authority.

The Decision on Strengthening the Protection of Online Information, issued by the Standing Committee of the National People's Congress on December 28, 2012, and the Order for the Protection of Telecommunication and Internet User Personal Information, issued by

15

the MIIT on July 16, 2013, stipulate that any collection and use of user personal information must be subject to the consent of the user, abide by the principles of legality, rationality and necessity and be within the specified purposes, methods and scope. An internet information service provider must also keep such information strictly confidential, and is further prohibited from divulging, tampering with or destroying any such information, or selling or proving such information to other parties. An internet information service provider is required to take technical and other measures to prevent the collected personal information from any unauthorized disclosure, damage or loss. ***Any violation of the above decision or order may subject the internet information service provider to warnings, fines, confiscation of illegal gains, revocation of licenses, cancelation of filings, closedown of websites or even criminal liabilities.***

With respect to the security of information collected and used by mobile apps, pursuant to the Announcement of Conducting Special Supervision against the Illegal Collection and Use of Personal Information by Apps, which was issued by the Cyberspace Administration of China [the "CAC"], the MIIT, the Ministry of Public Security, and the State Administration for Market Regulation on January 23, 2019, app operators shall collect and use personal information in compliance with the Cyber Security Law and shall be responsible for the security of personal information obtained from users and take effective measures to strengthen personal information protection. Furthermore, app operators shall not force their users to make authorization by means of default settings, bundling, suspending installation or use of the app or other similar means and shall not collect personal information in violation of laws, regulations or breach of user agreements. Such regulatory requirements were emphasized by the Notice on the Special Rectification of Apps Infringing upon User's Personal Rights and Interests, which was issued by MIIT on October 31, 2019. On November 28, 2019, the Cyberspace Administration of China, the MIIT, the Ministry of Public Security and the State Administration for Market Regulation jointly issued the Methods of Identifying Illegal Acts of Apps to Collect and Use Personal Information. This regulation further illustrates certain commonly seen illegal practices of app operators in terms of personal information protection and specifies acts of app operators that will be considered

16

as "collection and use of personal information without users' consen.t" [sic]

On May 28, 2020, the National People's Congress adopted the Civil Code, which came into effect on January 1, 2021. Pursuant to the Civil Code, the personal information of a natural person shall be protected by the law. Any organization or individual shall legally obtain such personal information of others when necessary and ensure the safety of such information, and shall not illegally collect, use, process or transmit personal information of others, or illegally purchase or sell, provide or disclose personal information of others.

(Emphasis added.)

62.     The generic disclosures about China's internet security regulations are in contrast to the Company's specific disclosures regarding the risks of relevant Chinese authorities' anti-trust and anti-monopoly investigations. The Registration Statement stated, in pertinent part, the following regarding its relevant regulations, discussions, investigations, and proceedings:

**LEGAL PROCEEDINGS**

We are regularly subject to various types of legal proceedings by drivers, consumers, employees, commercial partners, competitors, and government agencies, among others, as well as investigations and other administrative or regulatory proceedings by government agencies. In the ordinary course of our business, various parties claim that we are liable for damages related to accidents or other incidents involving drivers, consumers or other third parties on our platform. We are also subject to contractual disputes with drivers and other third parties. We are currently named as a defendant in a number of matters related to accidents or other incidents involving drivers, consumers and other third parties, and in matters related to contract disputes. Furthermore, we are involved in disputes with third parties asserting, among other things, alleged infringement of their intellectual property rights.

17

> ***There is no pending or threatened legal proceeding that individually, in our opinion, is likely to have a material impact on our business, financial condition or results of operations.*** However, results of litigation and claims are inherently unpredictable and legal proceedings related to such accidents or incidents could, in the aggregate, have a material impact on our business, financial condition and results of operations. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs individually and in the aggregate, diversion of management resources and other factors.

63.     Rather than disclose the known discussions into the Company's practices and non-compliance with relevant technology laws, the Registration Statement provided boilerplate risk statements about potential contingent future issues that may occur. While these risk statements acknowledged the material importance to investors of China's regulatory regime and potential investigations in into the Company, these statements neglected to warn investors of the ongoing technology-based issues, investigations, and discussions. The Registration Statement stated, in pertinent part, the following regarding its relevant risks, among other things, connected to data security and cybersecurity:

> Our business is subject to a variety of laws, regulations, rules, policies and other obligations regarding privacy, data protection and information security. Any losses, unauthorized access or releases of confidential information or personal data could subject us to significant reputational, financial, legal and operational consequences.

> We receive, transmit and store a large volume of personally identifiable information and other data on our platform. We are subject to numerous laws and regulations that address privacy, data protection and the collection, storing, sharing, use, disclosure and protection of certain types of data in various jurisdictions. See "Regulation" for laws, rules and regulations applicable to us, including the Data Security Law promulgated by the Standing Committee of the National People's Congress of China in June 2021, which will take effect in September 2021. Interpretation, application and enforcement of these

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

laws, rules and regulations evolve from time to time and their scope may continually change, through new legislation, amendments to existing legislation and changes in enforcement. We have incurred, and will continue to incur, significant expenses in an effort to comply with privacy, data protection and information security standards and protocols imposed by law, regulation, industry standards or contractual obligations. Changes in existing laws or regulations or adoption of new laws and regulations relating to privacy, data protection and information security, particularly any new or modified laws or regulations that require enhanced protection of certain types of data or new obligations with regard to data retention, transfer or disclosure, could greatly increase the cost to us of providing our service offerings, require significant changes to our operations or even prevent us from providing certain service offerings in jurisdictions in which we currently operate or in which we may operate in the future.

Despite our efforts to comply with applicable laws, regulations and other obligations relating to privacy, data protection and information security, *it is possible that our practices, offerings or platform could fail to meet all of the requirements imposed on us by such laws*, regulations or obligations. Any failure on our part to comply with applicable laws or regulations or any other obligations relating to privacy, data protection or information security, or any compromise of security that results in unauthorized access, use or release of personally identifiable information or other data, or the perception or allegation that any of the foregoing types of failure or compromise has occurred, could damage our reputation, discourage new and existing drivers and riders from using our platform or result in investigations, fines, suspension of one or more of our apps, or other penalties by government authorities and private claims or litigation, any of which could materially adversely affect our business, financial condition and results of operations. Even if our practices are not subject to legal challenge, the perception of privacy concerns, whether or not valid, may harm our reputation and brand and adversely affect our business, financial condition and results of operations.

Maintaining and enhancing our brand and reputation is critical to our business prospects. We were subject to negative publicity in the past, and failure to maintain our brand and reputation will cause our business to suffer.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

Maintaining and enhancing our brand and reputation is critical to our ability to attract new consumers, drivers and partners to our platform, to preserve and deepen the engagement of our existing consumers, drivers and partners and to mitigate legislative or regulatory scrutiny, litigation, government investigations and adverse public sentiment. Negative publicity, whether or not justified, can spread rapidly through social media. To the extent that we are unable to respond timely and appropriately to negative publicity, our reputation and brand can be harmed. ...

(Emphasis added.)

64.   The statements contained in ¶¶ 58-63 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Registration Statement was false and/or misleading and/or failed to disclose that: (1) Defendant DiDi "had the problem of collecting personal information in violation of relevant PRC laws and regulations"; (2) DiDi's app, DiDi Chuxing (Travel), would face an imminent cybersecurity review by the CAC; (3) the CAC suggested DiDi delay its IPO; (4) the CAC would require all Chinese app stores to remove DiDi Chuxing; and (5) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

65.   The statements contained in ¶¶ 58-63 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendant DiDi "had the problem of collecting personal information in violation of

relevant PRC laws and regulations"; (2) DiDi's app, DiDi Chuxing (Travel), would face an imminent cybersecurity review by the CAC; (3) the CAC suggested DiDi delay its IPO; (4) the CAC would require all Chinese app stores to remove DiDi Chuxing; and (5) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## **THE TRUTH BEGINS TO EMERGE**

66.     Then on July 2, 2021, the Company issued a press release entitled "DiDi Announces Cybersecurity Review in China" which announced, in relevant part, that: "pursuant to the announcement posted by the PRC's Cyberspace Administration Office on July 2, 2021, DiDi is subject to cybersecurity review by the authority. During the review, DiDi is required to suspend new user registration in China."

67.     On this news, the Company's ADS price fell 5% to close at $15.53 per ADS on July 2, 2021.

68.     The statements contained in ¶ 66 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendant DiDi "had the problem of collecting personal information in violation of relevant PRC laws and regulations"; (2) DiDi's app, DiDi Chuxing (Travel), would face an imminent cybersecurity review by the CAC; (3) the CAC suggested DiDi to delay its IPO; (4) the CAC would require all Chinese app stores to remove DiDi Chuxing; and (5) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

21

## **THE TRUTH EMERGES**

69.     On July 4, 2021, the Company issued a press release entitled "DiDi Announces App Takedown in China" which announced, in relevant part, that:

> *according to the announcement posted by the Cyberspace Administration of China (the "CAC") on July 4, 2021, the CAC stated that it was reported and confirmed that the "DiDi Chuxing" app had the problem of collecting personal information in violation of relevant PRC laws and regulations. Pursuant to the PRC's Cybersecurity Law, the CAC notified app stores to take down the "DiDi Chuxing" app in China*, and required the Company to strictly comply with relevant laws and regulations, follow the relevant standards set by the PRC government authorities, and rectify the problem to ensure the security of users' personal information.
>
> Once the "DiDi Chuxing" app is taken down from app stores in China, the app can no longer be downloaded in China, although existing users who had previously downloaded and installed the app on their phones prior to the takedown may continue using it. The Company will strive to rectify any problems, improve its risk prevention awareness and technological capabilities, protect users' privacy and data security, and continue to provide secure and convenient services to its users. *The Company expects that the app takedown may have an adverse impact on its revenue in China.*

(Emphasis added.)

70.     On July 5, 2021, the *Wall Street Journal* published an article entitled "Chinese Regulators Suggested Didi Delay Its U.S. IPO: Ride-hailing giant, under pressure to reward shareholders, pushed ahead with NYSE listing despite concerns of China's cybersecurity watchdog" which reported the following, in pertinent part:

> *Weeks before Didi Global Inc. [] went public in the U.S., China's cybersecurity watchdog suggested the Chinese ride-hailing giant delay its initial public offering and urged it to conduct a thorough self-examination of its network security*, according to people with knowledge of the matter.

22

But for Didi, waiting would be problematic. In the absence of an outright order to halt the IPO, it went ahead.

The company, facing investor pressure to list after raising billions of dollars from prominent venture capitalists, wrapped up its pre-offering "roadshow" in a matter of days in June—much shorter than typical investor pitches made by Chinese firms. The listing on the New York Stock Exchange raised about $4.4 billion, making it the biggest stock sale for a Chinese company since Alibaba Group Holding Ltd. BABA[]'s IPO in 2014.

Back in Beijing, officials, especially those at the Cyberspace Administration of China, remained wary of the ride-hailing company's troves of data potentially falling into foreign hands as a result of greater public disclosure associated with a U.S. listing, the people said.

Didi's American depositary shares began trading in New York on Wednesday, just a day before the ruling Communist Party celebrated its centenary.

The Cyberspace Administration waited a day after the major political event to deliver a one-two punch to the company. On Friday, it started its own cybersecurity review into Didi and blocked the company's app from accepting new users; and on Sunday, it ordered mobile app stores to pull Didi from circulation.

(Emphasis added.)

71.     On this news, the Company's ADS price fell $3.04 per ADS, or 19%, to close at $12.49 per ADS on July 6, 2021, the next trading day.

72.     Since the IPO, and as a result of the disclosure of material adverse facts omitted from the Company's Registration Statement, DiDi's ADS price has fallen significantly below its IPO price, damaging Plaintiff and Class members.

73.     Additionally, due to the materially deficient Registration Statement, Defendants have also violated their independent, affirmative duty to provide adequate disclosures about adverse conditions, risk and uncertainties. Item 303 of

SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii) requires that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations.

74.    As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

75.    Plaintiff brings this action as a class action on behalf of all those who purchased the Company's securities pursuant and/or traceable to the Registration Statement and/or during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

76.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

77.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

78.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

79.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the federal securities laws;

(b)     whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and to what extent the members of the Class have sustained damages and the proper measure of damages;

(c)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(d)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)     whether Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(f)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(g)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and;

(h)     to what extent the members of the Class have sustained damages and the proper measure of damages.

80.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I

**For Violations of Section 11 of the Securities Act**

**Against All Defendants**

81.   Plaintiff incorporates all the foregoing by reference.

82.   This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

83.   The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

84.   Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

85.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

86.   By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

87.   Plaintiff acquired the Company's securities pursuant to the Registration Statement.

88.   At the time of their purchases of DiDi securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful

26

conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

89.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

**COUNT II**

**Violations of Section 12(a)(2) of the Securities Act**

**Against All Defendants**

90.     Plaintiff incorporates all the foregoing by reference.

91.     By means of the defective Registration Statement, Defendants promoted, solicited, and sold DiDi securities to Plaintiff and other members of the Class.

92.     The Registration Statement for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased the Company's securities pursuant to the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Registration Statement as set forth above.

93.     Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Registration Statement at the time Plaintiff acquired DiDi securities.

94.     By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased DiDi securities pursuant to the Registration Statement sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the Registration Statement have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

95.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## COUNT III

### Violations of Section 15 of the Securities Act

### Against the Individual Defendants

96.     Plaintiff incorporates all the foregoing by reference.

97.     This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against all Defendants except the Underwriter Defendants.

98.     The Individual Defendants were controlling persons of DiDi by virtue of their positions as directors and/or senior officers of the Company. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of the Company. The Company controlled the Individual Defendants and all of DiDi employees.

99.   The Company and the Individual Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

100.   This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

## COUNT IV

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against Defendants DiDi and the Executive Defendants

101.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

102.   This Count is asserted against the Company and the Executive Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

103.   During the Class Period, Defendants DiDi and the Executive Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

104.   Defendants DiDi and the Executive Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)   employed devices, schemes and artifices to defraud;

29

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

105.   Defendants DiDi and the Executive Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

106.   The Executive Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

107.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the

30

falsity of the Company's and the Executive Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Executive Defendants' false and misleading statements.

108.   Had Plaintiff and the other members of the Class been aware that the market price of DiDi securities had been artificially and falsely inflated by the Company's and the Executive Defendants' misleading statements and by the material adverse information which the Company and the Executive Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

109.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

110.   By reason of the foregoing, the Company and the Executive Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT V

### Violation of Section 20(a) of The Exchange Act

### Against the Executive Defendants

111.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

112.   During the Class Period, the Executive Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because

31

of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

113.   As officers and/or directors of a publicly owned company, the Executive Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

114.   Because of their positions of control and authority as senior officers, the Executive Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Executive Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Executive Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

115.   The Executive Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and/or directors of the Company, they had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Executive Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

116.   By reason of the above conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.


Dated: July 9, 2021                          **THE ROSEN LAW FIRM, P.A.**

                                             /s/Laurence M. Rosen
                                             Laurence M. Rosen (SBN 219683)
                                             355 South Grand Avenue, Suite 2450
                                             Los Angeles, CA 90071
                                             Telephone: (213) 785-2610
                                             Facsimile: (213) 226-4684
                                             Email: lrosen@rosenlegal.com

                                             *Counsel for Plaintiff*

---

33